## M. V. SILVEIRA *v.* L. AHLO.

EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

SUBMITTED NOVEMBER 14, 1904. DECIDED DECEMBER 19, 1904.

FREAR, C.J., HARTWELL AND HATCH, JJ.

LEASE—*no estoppel of lessor to claim rent by reason of refusal of two months' rent accompanied by promise of new lease.*

A lessor by declining rent for two months after the burning off of the buildings on the leased premises, there being about five years unexpired on the term of the lease, and by telling the tenant that he would give him a new lease for a longer term, but without mentioning the rental or the length of the term, is not estopped

from claiming the rental on the existing leases after offering a new lease to the tenant, which the tenant declined; nor is the lessor thereby estopped from denying that the leases had been surrendered.

ID.—*leasing premises to a third person subject to existing leases.*

The lessor, by granting a lease for fifty years to a third person subject to the existing leases, does not thereby grant to such third person the right to the rental for the residue of the terms of the prior leases.

ID., EVIDENCE—*unrecorded certificate that new lessee takes lease subject to former leases.*

The defendant having shown a lease of the premises demised to him made by the plaintiff to a third person for a term of fifty years, the plaintiff may place in evidence an unrecorded certificate by the new lessee that he took his lease subject to the former leases.

ID.—*destruction of buildings on leased premises by fire ordered by the board of health.*

The destruction of the buildings on the leased premises ordered by the board of health does not operate as a surrender of the lease, the lessee not having taken steps to surrender it.

### OPINION OF THE COURT BY HARTWELL, J.

The plaintiff brought assumpsit claiming $4,467.20, rent due and payable on two leases from himself to the defendant, one dated April 10, 1888, demising certain land on Nuuanu street in Honolulu for fifteen years from May 1, 1888, at a monthly rental of $30, and the other dated January 17, 1890, demising another parcel on the same street for fifteen years from January 1, 1890, at a monthly rental of $130. The rents claimed are $4,160 on the first lease from January 1, 1900, to February 28, 1902, and $307.20 on the second lease for the years of 1900 and 1901. The plaintiff obtained a verdict for the sum claimed by him. The case comes up on the defendant's exceptions to three rulings concerning evidence made during the trial, the latter of which only is relied on in argument, namely, allowing the defendant to put in evidence a declaration or certificate dated June 26, 1900, by J. P. Mendonca to the effect that he knew that the pieces of land on Nuuanu street, described in a

lease of the land leased to defendant on the same day made to him by the plaintiff for a term of fifty years from October 1, 1900, were then under lease to the defendant, referring to the leases above mentioned, and further certifying that his own lease was "granted subject to" said leases to the defendant. The remaining exceptions are to the refusal to give instructions one and eleven for the defendant and to giving instructions one to sixteen (not including thirteen) for the plaintiff; also to a certain portion of the charge "not asked by either party in regard to surrender and cancellation of the leases."

The facts shown by the evidence are that about January 1, 1900, the premises of the defendant upon the land demised to him on leases declared upon were burned by order of the board of health at the time of the plague visitation. The wooden buildings on the land leased to defendant were burned January 10, the contents of a stone building in the rear having been burned December 31. The premises were "quarantined from December until May," (defendant's evidence, pp. 36, 51.) The plaintiff declined rent for January and February on the ground that he advised a new lease which he said he would give, and that it would not be worth the defendant's while to build brick buildings on land within the fire limits requiring brick buildings for the short time, five years, remaining of his leases. The defendant's brief says that "thereupon and until the 23rd day of August, 1901, ineffectual attempts were made to procure the execution of a lease." From the evidence, however, it appears that after many discussions between the parties concerning rental for a new lease, a form of lease was finally drawn up by the plaintiff and submitted to the defendant on November 9, 1900, which was submitted by the defendant to his attorney, Mr. Castle, who noted in pencil changes proposed by him to make the monthly rental of $300 named therein $180 for the residue of the terms of the old leases and to modify the condition therein expressed that the lessee should conform to the board of health regulations. The defendant says that the last talk he had with the plaintiff on the subject of a new lease was in

November of that year, when he took that lease back to Mr. Bolte, the plaintiff's agent, and told him "Your lease is no good," (p. 23, *Ib.*), and that it was for that reason that he "wouldn't sign the lease," (p. 24). The defendant "never had any further conversation with him," (p. 26). In December Mr. Castle drew up a form of lease which he proposed, which Mr. Bolte declined to take. There had been many discussions between Bolte and Ahlo about a new lease. The defendant testified that Bolte "proposed that I should cancel the lease. I said no, I wouldn't do that. I propose to rebuild brick buildings," (p. 16). "I asked Bolte why he refused to take my rent. He said by and by." That was early in March or late in February (pp. 20-21). In the latter part of February, 1900, "I asked Bolte for a new lease," (p. 27). He said, "All right, he would make a new lease," (p. 31). To the question whether he "declined to follow Bolte's suggestion of giving up the remainder of the old term," the defendant answered, "Because I wanted to build a one-story house there;" (p. 41), "that is the reason why I won't give it up. When the rent was due I went down there to pay him over the rent. He refused to accept it, otherwise I would have built the buildings there long ago." To the question, "And when you went there on the first of February to pay that rent you were insisting upon keeping your old lease for the balance of the term, were you?" A. "Yes, as I wanted to build a one-story house there." Q. "And at no time did you request Mr. Bolte to cancel that lease of January, 1900, did you?" A. "No." Q. "Have you at any time expressed a desire to have your lease cancelled?" A. "No," (p. 42). The defendant having testified that during quarantine time he made inquiries about the cost of new buildings, was asked, "Did your steps continue after the quarantine was raised?" A. "Well, I couldn't take any steps in the matter because when I tendered the rent to the lessor he refused to accept my rent." Further on the defendant testified, "After the quarantine I took steps for the building of two-story buildings because I asked Mr. Bolte about the lease. He promised that he would give me a

new lease for that; then I took steps in the matter for the building of two-story buildings," (p. 43). The defendant testified that he had secured $30,000 at eight per cent., meaning by "secured" that "the party promised that they would lend me the money in case I got a good lease," (p. 44). In October of 1900, when Bolte spoke to him about paying the rent, the defendant said that if Bolte would give him a new lease he could raise some money and would then pay the back rent, (p. 47). Campbell, book-keeper for the defendant's attorney, testified that he went with defendant to Bolte's office and tendered the rent for January, which Bolte refused, saying that it was "because he wanted to—he was going to re-arrange the whole matter," (p. 65). "He told me he was going to—wanted to make a new lease there, and my recollection is that he was—his reason for making a new lease was that he wanted to combine all the property," (p. 66). He said "Ahlo would be better off if he got a new lease," and that he didn't care to continue that old lease; * * * but Ahlo's position was that he declined to give up the old lease. * * * He insisted on going on with the rest of the term of the old lease * * * and wanted me to make these arrangements which never were done," (p. 68). "He said he was going to talk with Ahlo about it," (p. 69). Bolte testified that the draft of lease submitted to him by Castle was not executed "because Ahlo had no money." The Castle draft, he says, was "satisfactory on the whole," (pp. 86-87). There is no evidence that any steps were taken by Ahlo or his attorney in the matter after submitting to Bolte the Castle draft of a proposed new lease until June 5, 1901, when Castle wrote to Bolte the following letter:

"Dear Sir:—

With regard to the matters now standing between L. Ahlo and yourself, I have to suggest the following:

First. Fire Claims: Ahlo is willing to take 5-27 of the amount awarded for the buildings erected by him as the full amount of his claim, and whether he makes a new lease or the old lease is cancelled, he is not to be liable for any rents from

the time of the fire to the date upon the cancellation of that lease.

Second. To make a lease of the premises now or recently held by him under lease from your principal of forty-five years, at a monthly rental of $225, terms and conditions to be practically similar to those of the old leases, except, of course, he is to erect good fire proof buildings.

Third. Should you succeed in settling with Ahi so that Ahlo could lease the entire block between Chaplain lane and Pauahi on Nuuanu street, he will pay $310 per month.

Kindly let me hear from you on this matter at your earliest convenience."

August 23, 1901, Castle wrote to Bolte as follows:
"Dear Sir:—

With reference to the matter of lease with L. Ahlo, I desire to say that having had another conference with him, and saying in my opinion, there is no hope of meeting you on the subject of rent, he has decided to abandon the matter entirely, and suggests that the present leases be cancelled upon even terms; that he will execute the cancellation of the leases at any time you desire, but, of course, reserving to himself his interest in the award for losses by fire by the fire claims commission."

There is no evidence of any answer to either of the above letters. Bolte says with reference to the tender of rent in January that he "advised Ahlo to cancel his two leases and sit still until the plague is over, and then come and talk new leases business," (p. 92). He also says that in his draft of a lease he left the lessor's name blank "because I didn't know who the lessor would be," evidently referring to the fifty year lease to Mendonca, whose agent Bolte was (pp. 86 and 89).

The defense is (1) that the plaintiff's course amounted to a waiver of rent and of a formal surrender of the lease; (2) that the lease to Mendonca of fifty years gave him the rental, precluding the plaintiff from claiming it; and (3) that the plaintiff, by inducing the defendant not to erect temporary buildings on the land by promising him a new lease, by refusing rent for January and February and making no demand for it until August of the following year, and by leasing the land to another,

estopped himself either from claiming rent or that the lease had not been surrendered. The defendant's claim of the inadmissibility of Mendonca's certificate that his lease was subject to defendant's leases is based on his claim that he "had a right to rely upon the record and to say to the plaintiff, 'You have granted an estate inconsistent with my estate and it destroys the value of it. I have a right and do treat this as a surrender.' The plaintiff concealing the fact of the existence of this document cannot turn up at the trial and offer to show that the instrument on record is a different instrument from what it appears. This is elemental."

We are aware of no rule which precluded the plaintiff from showing the arrangement between himself and his lessee, or of any obligation resting upon him to inform Ahlo of the transaction. . By reason probably of the same person acting as agent for the plaintiff and his lessee, Mendonca, the plaintiff was not precluded by his lease to Mendonca from giving the defendant the lease he offered in November. A grant of the reversion, unless otherwise agreed, would give the grantee the right to future accruing rent, but the grantee may agree that the grant shall not carry the rent. *Burden v. Thayer,* 3 Metcalf 76 ; *Harmon v. Flanagan,* 123 Mass. 288. The exception to the introduction of the certificate is not sustained.

The question of the implied surrender and acceptance of the surrender was for the jury under appropriate instructions which were given by the court. The instructions which the court gave, to which the defendant excepted, were based upon the theory that there was no estoppel in the case. The instructions for the defendant which the court refused were based on the theory that there was evidence on which estoppel could be found. Looking solely at the defendant's evidence we are unable to discover in the case an element of estoppel. The proposal, offer or promise by the plaintiff to give a new lease and his advice to the defendant not to erect buildings on the premises under his old lease did not justify the defendant in relying upon getting a lease on such terms as he should desire. There was no definite promise

and could be none until the rent and other conditions of a new lease should be agreed upon. *Parker v. Cartwright,* 7 Haw. 596. In order that an estoppel result from conduct the conduct must be intended to influence the person claiming an estoppel, and also must be such as reasonably might influence him. *Kauhi v. Keoni Liaikulani,* 3 Haw. 356. "In order that the representation or act of a party shall operate as an estoppel, it must be clear that it was made advisedly, or at least 'negligently in disregard of the rights of others who are reasonably authorized to rely upon them.'" *Ib.* p. 357, citing *Keane v. Rogers,* 9 B. & C. 577. The defendant gave up his plan of erecting a temporary building in the hope that he would succeed in bringing the plaintiff to such terms for a new lease as would be satisfactory to himself and enable him to raise money for a permanent building. His failure to accomplish this was due to no bad faith or breach of agreement on the part of the plaintiff. The suggestion that the plaintiff's course was a gross fraud on the defendant does not accord with mutual understandings in business dealings between men of average intelligence. The plaintiff performed his promise in tendering a lease to the defendant. The only evidence concerning the lease proposed by the defendant's attorney in December of 1900 is that of the plaintiff, and it is uncontradicted, that it was in the main satisfactory to himself but was not executed in consequence of the defendant being unable to raise the money for the proposed building. The letters of the defendant's attorney contained the first proposal to give up the leases, but on condition that no rent be required. The plaintiff's failure to answer them did not estop him from claiming the rent. The refused instructions incorrectly assumed that there was evidence that the plaintiff had elected to adopt a course inconsistent with his relying upon the existing leases, or, in other words, that he relied on the defendant taking a new lease; that he abandoned and waived all rights under the old leases; that his conduct was such as could reasonably have led the defendant to give up a plan which otherwise he might have carried out, of making a temporary building by relying upon a

promise of the plaintiff for a new lease; that he had repudiated the relation of landlord and tenant and "told the defendant that the leases were terminated," and that his case was one in which "the aid of the court is invoked to give effect to a dishonest purpose." In *Union Mut. Life Ins. Co. v. Mowry,* 96 U. S. 544, cited in 11 Ency. L., 426, which is one of the defendant's citations in support of his instructions, the court said: "An estoppel cannot arise from a promise as to future action with respect to a right to be acquired upon an agreement not yet made." *Greton v. Smith,* 33 N. Y. 245, and *Welcome v. Hess,* 90 Cal. 507, are cases cited by the defendant. The former case was an action for rent for the year ending May 1, 1854. The parties agreed prior to that date that the plaintiff should rent the premises to the defendants for ten years at $275 a year, on which agreement the defendants continued in possession, paying the first quarter's rent at the agreed rate, until November 1, when the plaintiff refused to give the agreed lease or to allow the defendants to continue occupancy, and he resumed possession. The plaintiff admitted the agreement and that defendants remained in possession and paid for the first quarter on the strength of the agreement, basing his defense on the agreement not being in writing and also upon his having tendered a lease in October which the defendants refused. The plaintiff's conduct prior to tendering this lease and after receipt of rent for the first quarter was such that the defendants could not expect to remain on the premises. He said that he would "sign an instrument prohibiting the defendants from continuing the business for which they had agreed to lease the premises, * * * and boasted that he had the defendants in his power and could turn them into the street if they did not accede to his terms; * * * denied that the defendants were his tenants and repudiated any agreement." The court instructed the jury that under such circumstances the defendants were justified in abandoning the premises when they did and that they were not liable for any rent. That case certainly does not conform to the case before us. In *Welcome v. Hess* it was held that there was an implied accept-

ance of a surrender, the tenants having abandoned the premises and sent the keys to the landlord, who took possession of the premises and re-let them for a period longer than the remainder of the term without notifying the lessees that he should do so on their account or that he should continue to hold them liable for rent. Held that the landlord was estopped from denying that he had accepted surrender. The cases cited by the defendant do not appear to sustain his contention on the subject of estoppel. The defendant requested the court to instruct the jury that he was "not liable for rent for any time he may have been deprived of the beneficial enjoyment of the premises by act of the civil authorities during the quarantine," citing *Coogan v. Parker,* 2 S. C. 255, 16 A. R. 659. In that case the tenant had a seven years' lease of a building in the city of Charleston to be used as a restaurant. During the civil war the building had been so injured by the bombardment as to be uninhabitable. After the evacuation of the city the military forces took possession of the premises, of which, however, the defendant afterwards regained possession, which he kept until the termination of the lease. The court said: "It is not necessary to inquire whether a suffi-cient ground existed for a recision, for it does not appear that the defendant took any measures to rescind the lease," and held the defendant liable for the rent for "not having established a recision of the lease." In the present case the letters show an arrangement for the defendant receiving part of the money awarded for the destruction of his buildings and the evidence shows that he did not rescind the lease. We therefore cannot sustain the exception to the refusal of this instruction.

The exceptions are overruled.

*Robertson & Wilder* for plaintiff.

*Castle & Withington* for defendant.